IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| THE ESTATE OF GILBERT BARBER | ) | |
| by and through its administrators, JESSIE | ) | |
| BARBER and CALVERT STEWART | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:03CV547 |
| | ) | |
| B.J. BARNES, in his individual capacity | ) | |
| and official capacity as the Sheriff of | ) | |
| Guilford County, THOMAS GORDY, | ) | |
| in his individual and official capacity as a | ) | |
| Deputy Sheriff, the GUILFORD COUNTY | ) | |
| SHERIFF'S DEPARTMENT, and | ) | |
| PEERLESS INSURANCE CO., surety | ) | |
| for Guilford County Sheriff's Department, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

Beaty, District Judge.

This case involves claims under 42 U.S.C. § 1983 and related state law claims arising out

of the shooting death of Gilbert Barber ("Mr. Barber"). The claims are brought by The Estate

of Gilbert Barber, by and through its administrators, Jessie Barber and Calvert Stewart

(hereinafter "Plaintiffs"). Plaintiffs bring claims against Guilford County Sheriff B.J. Barnes

("Sheriff Barnes"), Deputy Sheriff Thomas Gordy ("Deputy Gordy"), and Peerless Insurance

Company ("Peerless"). Defendants have filed a Motion for Summary Judgment [Document #31]

seeking judgment in their favor as to all of Plaintiffs' claims. For the reasons discussed below,

Defendants' Motion for Summary Judgment [Document #31] will be granted, and this case will

be dismissed with prejudice.

I.    FACTUAL BACKGROUND[1]

Before dawn on the morning of May 18, 2001, Mr. Barber, a 22-year-old African-American, was involved in a single vehicle accident and may also have been assaulted, based on the limited information available to the Court on this point.  According to the State Highway Patrol accident report, the vehicle that Mr. Barber was driving ran off the road and struck several trees and a wire fence.  The speed at impact was approximately 65 miles per hour in a 35 mile per hour zone.  Apparently as a result of the accident, Mr. Barber's clothes and hair became entangled in the fence.  Thereafter, Mr. Barber apparently walked to a nearby church, leaving spots of blood in his path.  Police later determined that the glass doors of the church were shattered, and there were blood stains and footprints inside the church.  Also found inside the church were five of Mr. Barber's teeth and a wood collection plate with Mr. Barber's teeth

---

[1] In setting forth the Factual Background, the Court will first summarize the events leading up to the encounter between Deputy Gordy and Mr. Barber, based on the available evidence.  However, the Court notes at the outset that Plaintiffs have not presented any evidence or even allegations that any law enforcement officers were at the scene or were involved with Mr. Barber until Deputy Gordy arrived at 4:49 a.m.  With respect to the encounter between Deputy Gordy and Mr. Barber, Plaintiffs present a statement of the facts in their Response Brief based on the account given by Deputy Gordy in his 2001 deposition.  Plaintiffs contend that the 2001 deposition "provides a better understanding to the two minutes of interactions between [Deputy Gordy] and [Mr. Barber], critical to the material issues before the court." (Plaintiffs' Response Brief [Document #56] at n.1.)  Because this matter is before the Court on Defendants' Motion for Summary Judgment, the Court will accept Plaintiffs' contention and will summarize the facts regarding the encounter between Deputy Gordy and Mr. Barber as set forth by Plaintiffs based on the statements by Deputy Gordy in his 2001 deposition. The Court will then set forth all of the witness statements and documentary evidence before the Court, to determine if a genuine issue of material fact exists for trial.

impressions in the wood. Apparently, Mr. Barber's teeth were knocked out of his mouth from blunt force trauma, either by Mr. Barber hitting himself or perhaps by someone else striking him in the mouth with the collection plate. An autopsy later revealed that Mr. Barber had suffered a fractured skull from a blow to his forehead, as well as bruises, a large hematoma on his forehead, and other cuts and contusions to his face and body.

Soon thereafter, a 911 caller reported that a young man was creating a disturbance in the church yard. Deputy Gordy was dispatched to the scene. While en route, the dispatcher told Deputy Gordy they had "a second call from a different complainant advising the male subject is trying to stop cars, is running up and down the road, and also same will be naked." (Gordy 2001 Dep.) Gordy responded to the scene approximately five minutes later at 4:49 a.m. When Deputy Gordy pulled up, he observed Mr. Barber "leaning against the sign to the church," and Mr. Barber came toward Deputy Gordy's car "waving his arms like he needs some help." (Id.) Deputy Gordy stopped his car in the road, stepped out of it, and turned on his flashing blue strobe lights.

However, after Deputy Gordy turned on the blue lights, "it was like [Mr. Barber] changed from 'I need some help' to 'I'm going to get somebody.'" (Id.) Mr. Barber "then started talking about God was in his head, and was [Deputy Gordy] the Devil." (Id.) Deputy Gordy backed up and Mr. Barber followed him. When Deputy Gordy got behind his vehicle, he told Mr. Barber to stop. Deputy Gordy pulled out his pepper spray. Deputy Gordy was heard over his microphone telling Mr. Barber to "turn around" or "come here." Deputy Gordy told Mr. Barber

3

to "stay back," "show [Deputy Gordy] his hand," "turn around," and "get on the ground." (Id.) Deputy Gordy sprayed Mr. Barber with pepper spray when they were approximately 10 feet apart. Mr. Barber paused for a moment and then continued to advance toward Deputy Gordy. Deputy Gordy pepper-sprayed Mr. Barber again at a closer range, again hitting Mr. Barber in the face. Mr. Barber then walked behind Deputy Gordy's patrol car. While still holding the pepper spray in his hand, Deputy Gordy drew his weapon.

According to Deputy Gordy, Mr. Barber "charged at" him, Deputy Gordy put his left hand up to block Mr. Barber, Deputy Gordy was knocked into the air, and Mr. Barber's hands went toward the gun. Three shots were fired. Two shots hit Deputy Gordy in the leg. Deputy Gordy ended up on the ground, and tried to fire his gun but realized that it was jammed because the cartridge from the third shot had not fully ejected. Deputy Gordy later hypothesized that the gun jammed because Mr. Barber had his hand on the slide when the third shot was fired. Mr. Barber stepped back and Deputy Gordy then ejected the first magazine, located another magazine from his uniform, cleared the jammed casing, and loaded the new magazine into the gun. Deputy Gordy then located his microphone and radioed that he had been hit. This call was made approximately two minutes after Deputy Gordy first arrived on the scene. While Deputy Gordy was on the ground, Mr. Barber continued to circle him. Deputy Gordy told Mr. Barber to get on the ground, but Mr. Barber then charged at Deputy Gordy and reached for the gun. Deputy Gordy then shot at Mr. Barber three times. All three shots hit Mr. Barber at close range, one of

4

the shots fatally. According to Deputy Gordy, Mr. Barber took two or three steps back and fell down. (Id.)

There were several witnesses to this encounter, and given the nature of this case and the resulting death of Mr. Barber, in the interest of completeness, although laborious, the Court will set out each of the statements below.[2] First, Mr. Glenn Wayne Johnson had some interactions with Mr. Barber before Deputy Gordy arrived, and had what Plaintiffs describe as a "front row seat" to the encounter between Deputy Gordy and Mr. Barber. He made a statement to police after the incident and signed a written statement at 8:20 a.m., less than four hours after the encounter. Mr. Johnson first described how he woke up at approximately 3:45 a.m. and heard a car wreck, and the events that unfolded from there:

> I just figured there was a wreck so I went and got my clothes on and got in my truck to go see if I could find a wreck. I left my driveway and went towards Riverdale Rd. Castle McCullick area. At first I didn't see anything and then I pulled into the driveway at Castle McCullick and saw the tire tracks. I tried to look for a car but I couldn't see one. I came back down towards the church. I thought it might be on the otherside of the road near the church. I turned around in the intersection of Kivett Dr. and Kersey Valley Rd and went back towards Castle McCullick again. I seen a man standing in the lower driveway of the church that goes on to Kivett Dr. I must have seen him before I turned around because by the time I got turned around he was gone. This man had on a tan T-shirt and his hair looked like it was tied in knotts. He was a black man. It looked like he waved like he knew I was looking for him so I turned around and went back. When I got back he was gone. So I rode up and down Kivett Dr. trying to find him or the wreck. I was coming back towards Kersey Valley and I seen a man in the parking lot of the church waving his hands. I stopped and rolled down my window and asked was he ok. That's when I noticed he was naked. This man had braids or corn rows that's why

---

[2] The Court will set out the witnesses statements from the handwritten versions signed and adopted by the witnesses after the incident and submitted in the present suit with each witnesses' affidavit. The Court, however, will not make any corrections for clarity or spelling.

I don't think it's the same guy. The other guy had knotts.[3] When I asked he was he ok he was waving his arms and said "God is Good." He stared walking towards me and I said wait a minute what's going on. He got to the road. I put my hand on my pistol and said wait a minute what's going on? He was waving his arms shacking his fist yelling "God is Good God is Good." He got within 3 feet of me and I pointed my pistol at him and said get away and then I drove off. I went up to the Citco on Kivett Dr. I asked the lady to call the Sheriff that there was a crazy man out on Kivett Dr. I told her I would wait for the Sheriff and if he would meet me there I would show him what was going on. When the Sheriff pulled out of Harvey Rd I came in behind him. I followed him down to the church. He turned on his blue lights and I stopped in behind him. The best I know the man was out in the middle of the road when he stopped. I backed my truck up to give the Sheriff plenty of room. The lady in the burgandy pulled beside the officer at first and then turned around and pulled back behind me. I made sure me and her both could move if the officer needed more room. I was watching the officer and the guy. The officer's door was open (driver's door) and the guy was standing at the front of the car (fender head light area). The guy was still shacking his arms and fist say "God is Good God is Good." The officer told him to "step back and calm down." At this point he came towards the officer still waving his arms and his hands. The officer stepped away from is car door and the guy kept coming towards him. The officer pulled his mace out. The hole time he was telling him to step back and calm down. The officer maced the guy and the guy still kept yelling and coming towards the officer. The officer was backing up still keeping a good distance between them. Evidently he ran out of mace because I seen him drop his mace and pull out his pistol. The guy was still yelling and told the officer "I'm not afraid of your gun." The officer was telling him to "Get back and get on the ground." The officer was saying this the hole time. The officer gave him every chance, I thought was was going to wait too late. The guy lunged towards the officer like he was going to attack him. The officer stumbled and that's when I heard what I think was three shots. The hole time the guy still waving his arms yelling "God is Good God is Good." The officer was on the ground sitting on his butt and the guy dove at the officer. That's when the officer fired the next three or four shots. The guy fell over and I asked the officer was he ok. I said officer I'm here to help you are you ok? He told me he had been shot. I put my pistol in my pocket and came up and checked on the officer. When I seen he was bleeding I told him I had some red rags and then I went back to my truck and got them. I asked him who did I need to call and get him help. He said he already had help coming. Miss Hall she came out of the house and we held the rags on his leg until the other officers and the ambulance came. While we were helping the officer I was keeping

---

[3] Although the evidence is unclear on this point, this second person could have been involved in the possible assault on Mr. Barber.

an eye on the other guy to make sure he didn't get back up and try to attack again. When the police officers came I gave my pistol to a High Point police officer. I told him what had happened and then I talked to the other Sheriff. By this time everyone else had got here. (Aff. of Glenn Wayne Johnson [Document #41] Ex. A.)

Ms. Brenda Williams was on her way to work that morning and was in the burgundy car that pulled up and then turned around and pulled behind Mr. Johnson's truck. She signed a statement at 7:55 a.m. that morning stating that:

> I saw a truck parked behind the Sheriff's car about 50 feet back from the Sheriff's car. The Sheriff was standing behind his car and I saw a naked man standing about 12 to 15 feet in front of the Sheriff facing him. The Sheriff was loudly telling the naked man to lay down and stop, the naked man was just standing in the road wobbling. . . . I saw the naked man charge at the officer and then there was a struggle. The officer and the naked man were on the ground struggling and I heard two shots. The officer and the naked man seperated after the shots were fired and the officer was telling the naked man to back off and lay down now. The naked man was standing in the road and I saw that the officer had his gun out and I believe he had gotten back up or was sitting down in the road. The naked man charged at the officer again and I heard 3 shots, the shots were fired as the naked man was charging at the officer but before he reached the officer, the officer had no choice but to shoot the naked man. After I heard the 3 shots, the naked man went down and the officer was sitting in the street. . . . The only thing I am fuzzy about is wether or not the officer was up or down when he shot the naked man, I think he was down but I can't swear to that. (Affidavit of Brenda Williams [Document #44] Ex. A.)

Mr. Jerry Wayne Ritter lives on Kivett Drive and also witnessed portions of the encounter between Deputy Gordy and Mr. Barber. However, in his statements, Mr. Ritter indicates that he heard the gunshots, but did not see the actual encounter between Mr. Barber and Deputy Gordy. Mr. Ritter described what he heard and saw in a statement at 7:50 a.m. that morning as follows:

It was about 5:00 a.m., I heard two loud bangs, pretty close together. I got up to see what was going on and could see the blue lights. I could see the naked man. From where the man is lying now, he was about 20-30 feet back closer to the church. The man was facing towards Kersey Valley and when I looked out of our bedroom window, I could see the man. I then heard two more bangs and could see the flashes directly in front of the man. The man then started running towards Kersey Valley direction, it looked like he was running on the edge of the road, or the ditch-line. I then ran to my daughter's bedroom. My daughter is 15. She was looking out the window and I told her to get down away from the window. When I looked out the window, I could see the man had fell to the ground. I don't think the man was moving at this point. I could see the officer who was squatted down approx. 10-15 feet from the body, between the church and the man, again it looked like the officer was on the edge of the road, or the ditch-line. (Aff. of Jerry Wayne Ritter [Document #43] Ex. A.)

Mr. Ritter gave an additional statement a few days later on May 23, 2001, in which again indicated that he heard the "pops" but did not see the encounter, and he described the events as follows:

I was first awaken by two "pops"/noise that I heard. When I hear these "pops," I got out of my bed and looked out my bedroom window. I could see the blue lights, but I don't remember seeing the patrol car. I could see the naked man, at the time, I thought he was a white male. The man was running up the hill towards Kersey Valley. When I seen the man, he was at the entrance/driveway further away from the rear door entrance to the church. He was there at the metal gates. Shortly thereafter, while I was still in my bedroom, I could hear two more "pops." I then left my bedroom and went into my daughter's bedroom and I noticed my daughter looking out the window. I told her to get out of the window. I turned around and told Debbie (my wife) to call 911. I then went to the window and noticed the naked man lying down. I looked further down, about 15 feet away, and noticed the Deputy kneeling down. I saw the white pick-up truck pull down and the man opened his door, and raised both arms into the air, and I remember the lady from next door running towards the officer. . . . I never seen any physical confrontation or the encounter between the Deputy and the suspect. (Aff. of Jerry Wayne Ritter [Document #43] Ex. B.)

Ms. Shirley Hall lives next door to Mr. Ritter and witnessed the encounter between Deputy Gordy and Mr. Barber. She gave a statement at approximately 9:25 a.m. describing what she saw:

> Jennifer, my daughter, came into my room. It was 4:25 a.m. She said there was a naked man running around out here. I got out of bed went to the front bedroom window and saw a man with no clothes standing in the church parking lot near the fellowship hall doors at the corner of the building. Within seconds he left that location and walked straight out to the grassy edge next to the road. He stood there arms raised up to the sky yelling. It was just a sound no words. He just walked back and forth a couple of times then towards the church again. Then he started walking towards Kersey Valley Rd and stopped. He was still in the church yard. At this point I saw the blue lights. That's when I came to my back door. The guy was already up there confronting the deputy. He and the deputy were at the back of the deputies car in the road (right lane). He and the Deputy were at the back of the Deputies car in the road (right lane). I saw the "crazy man" and the Deputy struggling. The man was on the Deputy. I couldn't see a gun. This is when the first three shots went off, Bam, Bam, Bam. It was like a pause of one or two seconds and then the next shots went off. It was like one or two I cannot remember. When I heard the last shots I could see the deputies back. I couldn't see the crazy man no more but the deputy went to a sitting position. I yelled at my husband to call 911 back that the deputy was down. I ran off out the back door. I looked at my mother-in-law and she was sobbing. I ran to the Deputy. I put my arm around his shoulder and asked are you all right? Have you been shot? He said yes. I said how many times were you shot? He said once. He was holding the inside thigh area of his leg. I said I think you've been shot another time I could see the hole in his pant leg and the blood but I didn't tell him that. I told him help was on the way it was gonna be ok. My husband cam running up. I told him to get some towels. . . . Back before shots were fired Officer Gordy told the crazy guy to get down on the ground, the Gordy told him to get down on the damn ground, then Gordy said get down on the "fucking ground" then the guy lunged at him. They struggled and I heard the first round of shots. (Affidavit of Shirley C. Hall [Document #38] Ex. A.)

Shirley Hall's daughter, Ms. Jennifer Hall, also witnessed the encounter and described it in a statement given at 8:55 a.m. that morning:

Around 3:30 a.m. this morning I heard arguing outside, screaming and yelling. It sounded to me like two different people arguing, two males. I also heard a noise, it sounded like someone getting thrown up against a wall. The arguing and noise went on for about 5 minutes and then I didn't hear anything any more. I looked out my side window and my front window from my bedroom and I didn't see anything. I figured it was a neighbor arguing so I went back to bed. Right around 4:15 a.m. or 4:20 a.m. I was woken up again by someone yelling. I looked out my front window and I saw a naked man yelling and pacing back and forth on the sidewalk between the fellowship hall and Oak Grove Baptist Church. I saw the man throw himself against up against one of the two doors to the fellowship hall and the he started walking out toward the road and he stopped in the grass before he got to the road. I ran downstairs and woke my parents up and my mom and I were looking out the window and my dad called 911. My dad stayed on the phone with 911 and my mom and I were watching the man and telling my dad what he was doing until the officer got there. When the officer got there, my mom and I went to the screen door on the side of our house, my dad stayed on the phone. The officer got out of the car and the naked man started coming towards the officer, I think he started running but I'm not positive. The man got really close to the officer and I could hear the officer saying "Get down on the ground now," I think he said it three times, I know the last time he said "Get down on the fucking ground" and then the officer started pepper spraying the man. The officer was on the ground. I think the man knocked him down after they struggled right after the officer pepper sprayed the man. I heard shots, I couldn't say how many, as the officer was on the ground and the man was right in front of him standing up. I saw the officer try to get up and he fell back to the ground, I know the man was still right there but I don't know what he was doing because I was watching the officer. I heard more shots and then I saw the man fall. I don't remember if the officer or the man were saying anything. My mom ran out of the house to the officer . . . . I forgot earlier, but while my dad was on the phone with 911 and my mom and I were watching out the window, my neighbor Wayne Johnson drove by and turned around and came back and stopped in the road and the man started yelling at him and charged at Waynes car (truck) and Wayne sped off. (Affidavit of Jennifer R. Hall [Document #37] Ex. A.)

Finally, Jennifer Hall's father and Shirley Hall's husband, Tommy Eugene Hall, gave a statement to police a few days after the incident occurred to provide his additional observations of the encounter:

10

It was about 4:20 a.m. when my daughter, Jennifer, woke me and my wife. Jennifer was telling us that there was a naked man over at the church. Jennifer said something about two guys fighting. I got up immediately and went to look out the window. The man was standing at the corner of the church, the northeast corner, in front of the fellowship hall. The man had his back against the wall looking west towards High Point. Then the man walked into the corner where the glass doors are, and then turned around and came back to where I first seen him. I turned around to pick the phone up to call 911. The first time I called 911, it rang 3 or 4 times before someone picked up. I heard a vehicle go by traveling east. At the time, I did not know who it was but I now know it was a neighbor, Wayne Johnson. The vehicle had turned around and come back and I heard the vehicle stop. At this point, 911 picked up the phone, and the vehicle had left. I heard the vehicle drive off. I was on the phone with 911 and at this point, the man was walking around in the gravel parking lot. The man seemed to be "wandering" around and at times, the man looked like he was going to take off running but then he didn't. The man did this a couple of times. The man then went back to the church corner where I first saw him. The 911 operator was asking what the man was doing. I think the 911 operator stated someone was on the way. The 911 operator further advised if the man started to leave the area, to call 911 back. I hung up the phone and reached for my pants. My mother called me on the phone at this time. The man had walked past the front of our house. I told my mom I've called 911, and I would be there at her house in just a second. My mom was hysterical and we hung up. As I hung the phone up and putting my pants on, my wife Shirley stated, "They're here." I finished putting my pants on. I was looking for a shirt and I heard two shots. I remember 2 shots and I called 911 again. It seemed like he answered immediately. I told the 911 operator shots have been fired and the officer is down. While I was on the phone with the 911 operator, I heard 3 more shots. I told the 911 operator that I needed to go because my mom was next door and she was hysterical. I hung the phone up and I slipped my loafers on. I went out the back door. I saw the blue lights and my wife was already there with Officer Gordy. This was right behind the patrol car. I kept running, I was running to my wife and Officer Gordy. When I got there to them, my wife told me to get some towels. I went to my mother's house to get the towels. I got the towels and ran back to the officer and my wife. I gave one towel to my wife and I took the other towel and put it on the officer's inner thigh of his left leg. At this time, I noticed a shell casing to the left of Officer Gordy's left foot. There was another shell casing at left foot of the suspect. The clip/magazine was laying just a little bit further away to the right. I'm continuing to keep pressure on the officer's leg. The city officer arrived and I first seen him to my left shoulder. The city officer spoke to Officer Gordy and said, "I'm going to take possession of your weapon, partner." Officer Gordy acknowledged by saying okay. The city officer could not get the weapon out

11

of the holster. I then noticed the county officer was there. The city officer asked the county officer/deputy, "How do you all get your weapons out of the holster?" The officer (city) took possession of the gun while I was noticing Officer Gordy lower leg was bleeding pretty bad. This is when the ambulances arrived. When I first started helping Officer Gordy, I was trying to keep an eye on the suspect as well. Shortly thereafter, I moved out of the way so the medical personnell could attend to the officer. (Affidavit of Tommy Eugene Hall [Document #39] Ex. A.)

After performing an autopsy, the medical examiner concluded that Mr. Barber died of a gunshot wound to the chest. At some point that morning, Mr. Barber had also suffered a "blunt force injury to the head" resulting in an abrasion and contusion on his forehead and a linear skull fracture, as well as abrasions, scratches and contusions to his right and left legs, the back of his right hand, and the top of his head. (Aff. of Mary O'Keefe [Document #42] Ex. 1.)[4] In addition, a lab report was prepared reflecting the postmortem toxicology analysis performed by the Medical Examiner's Office on blood and urine samples taken from Mr. Barber after his death. The lab report noted that Mr. Barber's urine sample reflected the presence of benzoylecgonine, which is a metabolite of cocaine, which indicated that cocaine was received into Mr. Barber's body during the previous 24 to 72 hours. (Aff. of Ruth Winecker [Document #45].) A lab report was also prepared by the State Bureau of Investigation containing the results of a Gunshot Residue Test performed by the Bureau's Laboratory on a swab sample taken from Mr. Barber's hands after his death. This lab report confirmed the presence of gunshot residue on Mr. Barber's

---

[4] As previously noted, Plaintiffs have not presented any evidence or allegation indicating that Deputy Gordy or any Sheriff's Office official was involved in or responsible for these earlier injuries to Mr. Barber.

hands. (Aff. of Deborah Burwell [Document #35] Ex. 1; Aff. of Patricia Wisneski [Document #46].)

Although Mr. Barber had never previously been diagnosed or treated for any mental illness, Plaintiffs allege that Mr. Barber was obviously emotionally disturbed, and that Deputy Gordy failed to follow accepted police practices for situations involving emotionally disturbed persons. Specifically, Plaintiffs contend that Deputy Gordy failed to follow standard procedures when he turned on his blue strobe lights, used pepper spray, yelled at Mr. Barber, and used his gun against an unarmed emotionally disturbed person. Plaintiffs further contend that Sheriff Barnes failed to adopt proper policies and failed to train his deputies on how to respond to an emotionally disturbed person. However, Plaintiffs have not presented any evidence or expert testimony in this regard.

With regard to the training provided by Sheriff Barnes, Defendants note that Deputy Gordy had received training on the Sheriff's Office "use of force" policy. This policy provided that deadly force, including discharge of a firearm, must not be used unless "it reasonably appears to the officer to be necessary under the circumstances then known to him." Specifically, an "officer is authorized to use deadly force against another person in a situation which, under the circumstances then known to the officer, it reasonably appears necessary in order to defend himself or others against the use or immediate threatened use of deadly force." In addition, Deputy Gordy received 580 hours of Basic Law Enforcement Training at Guilford Technical Community College before beginning work as a deputy. During that Basic Law Enforcement

13

Training, Deputy Gordy received specific training on "Special Populations" and dealing with a "mentally disordered person." This training advised listening to the individual, avoiding threatening behaviors and unnecessary sensory input, and calling for back-up if possible, as well as a general directive to "THINK SAFETY AND TREATMENT - YOU ARE NOT ARRESTING." (Aff. of Thomas Gordy [Document #36] Ex. 1, 2.) Deputy Gordy was also required to undertake fourteen weeks of field training with more experienced officers before beginning patrols, and has been required to receive additional training since beginning work as a deputy. (Id.)

Based on these contentions, Plaintiffs bring claims against Deputy Gordy and Sheriff Barnes for excessive force in violation of the Fourth Amendment and wrongful death under North Carolina law.[5] Defendants have filed a Motion for Summary Judgment as to all of Plaintiffs' claims, contending that there are no genuine issues of material fact and that Defendants are entitled to judgment in their favor as a matter of law. The Court will consider that Motion below.

---

[5] All of the other claims have previously been dismissed by the Court or specifically abandoned by the Plaintiffs. The Court notes particularly with respect to the Equal Protection/race discrimination claims that were originally brought in this case, that Plaintiffs have abandoned those claims because, by Plaintiffs' own admission, "[a]fter reviewing the Use of Force Reports provided to Plaintiffs in discovery that showed the race of people subjected to force during a stop or arrest, no provable race disparity was found." (Plaintiffs' Response Brief [Document #56] at 10.)

14

## II.  STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  Thus, the Court is not "'required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986) (quoting Schuylkill & Dauphin Improvement & R.R. Co. v. Munson, 81 U.S. (14 Wall.) 442, 448, 20 L. Ed. 867, 872 (1872)).

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is considered "material" if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  There can be "no genuine issue as to any material fact" if the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case," since "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S.

317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510. As a result, the Court will only enter summary judgment in favor of the moving party when " 'the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the [nonmoving] party cannot prevail under any circumstances.' " Campbell v. Hewitt, Coleman & Assocs., 21 F.3d 52, 55 (4th Cir. 1994) (quoting Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co., 381 F.2d 245, 249 (4th Cir. 1967)).

When ruling on a summary judgment motion, the Court "view[s] the evidence in the light most favorable to the non-moving party, granting that party the benefit of all reasonable inferences." Bailey v. Blue Cross & Blue Shield, 67 F.3d 53, 56 (4th Cir. 1995). The moving party bears the initial "burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law." Catawba Indian Tribe v. South Carolina, 978 F.2d 1334, 1339 (4th Cir. 1992)(en banc). Once the moving party has met this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Id. In so doing, the nonmoving party may not rest on mere allegations, denials, or unsupported assertions, but must, through affidavits or otherwise, provide evidence of a genuine dispute. Anderson, 477 U.S. at 248–49, 106 S. Ct. at 2510; Catawba Indian Tribe, 978 F.2d at 1339. In other words, the nonmoving party must show "more than . . . some metaphysical doubt as to the material facts," for the mere existence of a scintilla of evidence in support of its position is

insufficient to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); Catawba Indian Tribe, 978 F.2d at 1339. With this standard in mind, the Court must evaluate the merits of Plaintiffs' claims to determine whether summary judgment in favor of Defendants is proper in the present case.

III.  FOURTH AMENDMENT CLAIMS

A.  Fourth Amendment Claims Against Deputy Gordy

The Fourth Amendment's prohibition on unreasonable seizures bars police officers from using excessive force against a free citizen such as Mr. Barber. See Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). "Whether an officer has used excessive force is judged by a standard of objective reasonableness. . . . We do not inquire into an officer's motives, intentions, or tendencies, and instead determine 'whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force.'" Clem v. Corbeau, 284 F.3d 543, 550 (4th Cir. 2002) (quoting Elliott v Leavitt, 99 F.3d 640, 642 (4th Cir. 1996)). "Recognizing that 'police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving' – we take care to consider the facts from the perspective of a reasonable officer on the scene, and avoid judging the officer's conduct with the '20/20 vision of hindsight.'"  Clem v. Corbeau, 284 F.3d at 550 (quoting Graham, 490 U.S. at 396-97, 109 S. Ct. at 1872).

"When deadly force is at issue, the Supreme Court has long recognized that the intrusion on Fourth Amendment rights is unmatched.  Such force is therefore justified only where a

17

reasonable officer would have sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." Clem v. Corbeau, 284 F.3d at 550 (internal quotations and citations omitted). In applying this standard, the ultimate question is "'whether the totality of the circumstances justifies' the use of deadly force given all the circumstances of the case." Clem v. Corbeau, 284 F.3d at 550 (quoting Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)). The Fourth Circuit has also noted that "the law is clear that a reasonable officer is sometimes authorized to use deadly force against an unarmed, mentally ill person, i.e., when the officer has a sound reason to believe that such a person poses a serious threat to [his] safety or the safety of others." Clem v. Corbeau, 284 F.3d at 554.

In the present case, Plaintiffs contend that "a reasonable and prudent police officer would have known [Mr. Barber] needed, was begging for, some help." Plaintiffs also contend that Mr. Barber "posed no immediate threat to Gordy or anyone else until after he was provoked." Plaintiffs state that the evidence indicates that Mr. Barber "was in a terrible car crash with a hairline skull fracture and a large hematoma on his forehead and multiple lacerations on his head, and he was trying to get some help in a strange place." Plaintiffs state that "[a]ll [Mr. Barber] wanted was a helping hand. Some balm for his wounds. Maybe a ride to the hospital or his home." However, Plaintiffs have not presented any evidence whatsoever supporting this theory or contradicting the witness statements outlined above. Instead, in their Response Brief, Plaintiffs question the witness statements and contend that the witnesses were biased because witness Shirley Hall's daughter, Ashley Case, works for the Sheriff's Office, and her son-in-law,

18

Brian Case, is a Deputy Sheriff.[6] However, Shirley Hall only happened to be a witness in this case because the events occurred outside her home. Moreover, even if Shirley Hall and her family's statements are not considered, the encounter is separately described in the testimony of other witnesses, including Wayne Johnson and Brenda Williams, who have no connection to the Sheriff's office.

Wayne Johnson provided a particularly detailed account of the interaction, and also described how he attempted to help Mr. Barber before Deputy Gordy arrived, but drove off after Mr. Barber charged at him in a threatening manner and continued yelling "God is Good." Thus, Mr. Barber was posing a threat to other citizens, even before Deputy Gordy approached.[7] In addition, the witnesses corroborate Deputy Gordy's account of the events as to the primary issues: When Deputy Gordy arrived at the scene, Mr. Barber came at Deputy Gordy yelling "God is Good" and "Are you the Devil." Deputy Gordy told him to get back. Deputy Gordy backed up around his patrol car to move back from Mr. Barber. Mr. Barber continued to advance. Deputy Gordy told Mr. Barber to stop and to get on the ground. Mr. Barber kept

---

[6] Ashley Case, who works in the Sheriff's Office, was not involved in taking any of the witness statements after the incident occurred, but was apparently involved several months later in typing an internal police report regarding the incident. While this may have been unwise given her mother's role as a witness, the report itself was part of an internal investigation and does not affect the witness statements themselves or other evidence presented in this case.

[7] In addition, Ms. Betty Hall made a statement to police indicating that she went outside to get the newspaper at approximately 4:00 a.m., and heard a man screaming and yelling near the rear entrance of the church. Ms. Hall told police that the man began running towards her and she became scared and ran back in the house and called 911.

moving towards Deputy Gordy. Deputy Gordy took out his pepper spray and pepper sprayed Mr. Barber but Mr. Barber kept coming. Deputy Gordy either tripped, stumbled, or was knocked to the ground, and there was a struggle for Deputy Gordy's gun, during which Deputy Gordy was shot. After he had been shot, Deputy Gordy fixed his gun and ordered Mr. Barber to the ground. Mr. Barber lunged at Deputy Gordy, and only then did Deputy Gordy fire the fatal shots at Mr. Barber.

Plaintiffs attempt to establish minor variations between the summary of the witness statements taken at the scene and the actual statements signed by the witnesses at the police station later in the morning. However, even if the Court accepts Plaintiffs' proffer of these summaries, there are no material differences in the statements. For example, Plaintiffs contend that in Mr. Johnson's initial statement to police at the scene, he did not report any actual physical contact between Mr. Barber and Deputy Gordy. However, Mr. Johnson's initial statement is consistent with his later statement and affidavit. Specifically, the officer at the scene summarized Mr. Johnson's initial statement as follows:

> "He stated he saw the naked man run towards the deputy. He heard the deputy tell the guy to back off. He heard him tell him several times to back off. He saw the deputy pull his pepper spray. The naked guy told the deputy he was not afraid and that God was Good. The deputy peper sprayed the naked guy. The naked guy kept coming towards the deputy. The deputy kept backing up. The deputy told the guy to get on the ground. He heard the naked guy tell the deputy that he was not afraid of his gun. The deputy kept backing up and triped. The naked guy kept coming at the deputy. He heard two to three shots. The naked guy stumbled. He heard the deputy yell and tell the naked guy to get back. Mr. Johnson stated he heard three or four more shots. He saw the naked guy fall foward on the ground and roll over on his back."

20

This Court finds that there are no material differences in Mr. Johnson's statements, and that even if the Court considers this summary of his initial statement at the scene, there is nothing that would support Plaintiffs' theory that Mr. Barber was not threatening anyone and was just trying to get help. In addition, this summary would not provide any basis to discount the more complete statement made by Mr. Johnson a few hours later, as set out previously, which he signed at the time and which Mr. Johnson has now submitted to this Court with his affidavit in this case.

Plaintiffs also contend that witness Jerry Ritter described Deputy Gordy as "kneeling" when the second shots were fired, while Deputy Gordy and the other witnesses stated that he was sitting on the ground. Plaintiffs similarly imply that because the second set of shell casings was in a different location than the first set of shell casings, Deputy Gordy must have changed locations, and may not have actually been shot or downed after the first set of shots. However, the distinction between "kneeling" and "sitting" is not material in this instance. In addition, Deputy Gordy has stated that after he was shot, he remained on the ground and used the foot on his uninjured leg to push himself around in order to keep Mr. Barber in front of him, which is consistent with the location of the shell casings. Plaintiffs offer no evidence, other than speculation and conjecture, to establish that Deputy Gordy otherwise changed locations between the sets of shots or that Deputy Gordy was not shot or downed after the first set of shots.

In addition, Plaintiffs question Deputy Gordy's hypothesis that the gun was jammed because Mr. Barber had his hand on the slide when the third shot was fired. Plaintiffs note that

21

there were no marks or abrasions on the inside of Mr. Barber's hands, but Plaintiffs have presented no evidence or expert testimony indicating that such marks or abrasions would be found. In fact, the State Bureau of Investigation analyzed the samples from Mr. Barber's hands, and concluded that there was, in fact, gun residue on Mr. Barber's hands. Therefore, the physical evidence supports Deputy Gordy and the eye witnesses' statements, and Plaintiffs have presented no evidence on which a jury could find otherwise.

Finally, to the extent that Plaintiffs contend that Deputy Gordy should have approached the scene differently because Mr. Barber was mentally ill, the Court notes first that Plaintiffs have failed to present any evidence that Mr. Barber was ever treated for or diagnosed with any mental illness. More importantly, even if Mr. Barber were mentally ill, there was no evidence that Deputy Gordy was aware of that fact prior to his arrival at the scene before the situation escalated. Finally, even if Deputy Gordy should have known that Mr. Barber was mentally ill, "the law is clear that a reasonable officer is sometimes authorized to use deadly force against an unarmed, mentally ill person, i.e., when the officer has a sound reason to believe that such a person poses a serious threat to [his] safety or the safety of others." Clem v. Corbeau, 284 F.3d at 554. Based on the evidence before the Court, the Court finds that Mr. Barber clearly posed a serious threat to the safety of Deputy Gordy, as well as a threat to the safety of other individual citizens in the area, and the Court further finds that a reasonable officer in the same circumstances would have concluded that a threat existed justifying the force used in this case.

Therefore, having considered all of the evidence, the Court finds that it is abundantly clear that Deputy Gordy acted in a reasonable manner under the circumstances. Plaintiffs have presented absolutely no evidence that would support their theory in this case or that would support a jury verdict in their favor as to any claim against Deputy Gordy. As with any factual issue, Plaintiffs may not rest on mere allegations, denials, or unsupported assertions, but must provide evidence of a genuine dispute. <u>Anderson</u>, 477 U.S. at 248–49, 106 S. Ct. at 2510. This Plaintiffs have not done. Having fully reviewed Plaintiffs' contentions, the Court concludes that any factual discrepancies alleged by Plaintiffs are either based on speculation and conjecture, or are not material to the ultimate conclusion because even taking Plaintiffs' version of all genuinely disputed factual issues as true, the Court concludes that Plaintiffs' factual allegations are not sufficient to support an ultimate finding in Plaintiffs' favor. While the Court acknowledges the loss suffered by Mr. Barber's parents, the Court nevertheless finds that Plaintiffs have failed to present any evidence that would create any genuine issue of fact with respect to whether Deputy Gordy acted in an unreasonable manner or in any way violated Mr. Barber's constitutional rights under the circumstances of this case. Therefore, Defendants' Motion for Summary Judgment as to the Fourth Amendment claim against Deputy Gordy will be granted.

B.     Fourth Amendment Claims Against Sheriff Barnes

With respect to Plaintiffs' Fourth Amendment claim against Sheriff Barnes for "failure to train," the Court notes first that this claim should be dismissed because the Court has found that there was no underlying constitutional violation by Deputy Gordy. <u>See, e.g.</u>, <u>Allen v. City</u>

of Muskogee, 119 F.3d 837, 841 (10th Cir. 1997) (noting that to establish liability for inadequate training regarding the use of excessive force, "a plaintiff must show [first that] the officers exceeded constitutional limitations on the use of force"). In addition, the law is clear that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204, 103 L. Ed. 2d 412 (1989). In this case, the uncontradicted evidence shows that Deputy Gordy received lengthy training before beginning duties as a deputy, including specific training in the use of force and the handling of "sensitive populations," including the mentally ill. Plaintiffs have failed to present evidence to establish any unconstitutional failure to train or evidence of deliberate indifference to the rights of citizens in the training provided and required by Sheriff Barnes. For these reasons, the Court concludes that Defendants' Motion for Summary Judgment as to the Fourth Amendment claims against Sheriff Barnes should also be granted.

IV.    STATE LAW WRONGFUL DEATH CLAIMS

Plaintiffs also assert state causes of action against Sheriff Barnes and Deputy Gordy for wrongful death pursuant to North Carolina General Statute § 28A-18-2. Under North Carolina law, an officer "has the right to use such force as may be reasonably necessary in the proper discharge of his duties" but "may not act maliciously in the wanton abuse of his authority or use unnecessary and excessive force." Todd v. Creech, 23 N.C. App. 537, 539, 209 S.E.2d 293, 295. Id. In the present case, because Plaintiffs have failed to present any evidence from which the jury

24

could find that Deputy Gordy acted unreasonably or used excessive force, as discussed above, Plaintiffs' state law claims also fail. See also Sigman v. Town of Chapel Hill, 161 F.3d 782, 789 (4th Cir. 1998) (noting that where the Court determines that the officer's actions were reasonable as a matter of law in the circumstances of the case pursuant to the Fourth Amendment, the officer's actions "cannot be negligent or wrongful, as required by N.C. Gen. Stat. § 28A-18-2(a)"). Therefore, Defendants' Motion for Summary Judgment as to Plaintiffs' state law claims will also be granted, and this entire case will be dismissed with prejudice.

V.     CONCLUSION

For the reasons discussed above, the Court concludes that Defendants' Motion for Summary Judgment [Document #31] should be GRANTED, and all of Plaintiffs' claims will be DISMISSED WITH PREJUDICE.

An Order and Judgment consistent with this Memorandum Opinion will be filed contemporaneously herewith.

This, the 29th day of June, 2006.

United States District Judge